## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JANINE ZIMMERS, | ) | Civil Action No. |
|  | ) |  |
| *Plaintiff*, | ) | Filed Electronically |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| AION MANAGEMENT, LLC, | ) |  |
|  | ) |  |
| *Defendant*. | ) |  |
|  | ) |  |

## COMPLAINT IN CIVIL ACTION

Plaintiff, Janine Zimmers, by and through the undersigned counsel, files the following

Complaint in Civil Action against Defendant, AION Management, LLC, averring as follows:

## THE PARTIES

1.      Plaintiff, Janine Zimmers ("Plaintiff"), is an adult individual who resides at 9765

Bellcrest Rd, Pittsburgh, Pennsylvania 15237.

2.      Defendant, AION Management, LLC ("Defendant"), is a foreign limited liability

company formed in the State of Delaware with a principal place of business located at 1 S Broad

St., STE 1900, Philadelphia, Pennsylvania 19107. Defendant maintains a registered office at 600

North Second Street, Suite 401, Harrisburg, PA 17101. Plaintiff reported to work on a regular

basis at Defendant's facility known as The View North Hills property ("The View").

## JURISDICTION AND VENUE

**A.      This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331 and Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367.**

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under the Age

Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq*. (the "ADEA") (Plaintiff's

claim arising under the ADEA is identified as the "<u>Federal Law Claim</u>").

4.      Plaintiff is also advancing claims under the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* (the "<u>PHRA</u>") (Plaintiff's claims arising under the PHRA are identified as the "<u>State Law Claims</u>").

5.      This Court may exercise supplemental jurisdiction over the State Law Claims pursuant to 28 U.S.C. § 1367(a) as the Federal Law Claim and the State Law Claims share operative facts that support the corresponding causes of action within the Federal Law Claim and the State Law Claims.

6.      Further, the operative facts between the Federal Law Claim and the State Law Claims mirror one another to such a degree that they form the "same case or controversy" under Article III § 2 of the United States Constitution which further supports this Court's exercise of supplemental jurisdiction over the State Law Claims.

**B.      The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

7.      Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (hereinafter, the "<u>Western District</u>") as a substantial part of the events and omissions giving rise to the Federal Law Claim and State Law Claims occurred within this judicial district. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

8.      Specifically, these events and omissions occurred within Allegheny County, Pennsylvania, which is one of the counties encompassed by the Western District.

9.      This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in Allegheny County, Pennsylvania, and conduct arising within Allegheny County is docketed within the Pittsburgh Division of the Western District Pursuant to LCvR 3.

**C.     This Court May Exercise Personal Jurisdiction Over Defendant.**

10.     This Court may exercise personal jurisdiction over Defendant pursuant to 42 Pa.

C.S. § 5301(a)(2), and this Court's exercise of jurisdiction comports with the Due Process Clause

of the United States Constitution.

11.     Personal jurisdiction is proper over a defendant if the defendant is a registered

Pennsylvania entity and has thus "consented" to the exercise of general personal jurisdiction

pursuant to 42 Pa. C.S. § 5301.  *Aetna Inc. v. Kurtzman Carson Consultants, LLC*, No. 18-470,

2019 BL 114021, at *5 (E.D. Pa. Mar. 29, 2019) (citing *Burger King Corp. v. Rudzewicz*, 471

U.S. 462, 472 (1985); *Bane v. Netlink, Inc.*, 925 F.2d 637, 641 (3d Cir. 1991)).

12.     42 Pa. C.S. § 5301 states: "The existence of any of the following relationships

between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to

enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such

person."  42 Pa. C.S. § 5301(a). This definition is expanded to "corporations" pursuant to 42 Pa.

C.S. § 5301(a)(2) which provides:

> Corporations.—
> (i) Incorporation under or qualification as a foreign corporation
> under the laws of this Commonwealth.
> (ii) Consent, to the extent authorized by the consent.
> (iii) The carrying on of a continuous and systematic part of its
> general business within this Commonwealth.

42 Pa. C.S. § 5301(a).

13.     As discussed above, Defendant has registered itself as foreign limited liability

company in the Commonwealth of Pennsylvania and accordingly subjected itself to the general

jurisdiction of Pennsylvania's tribunals; further, Defendant conducts business operations within

Pennsylvania. Accordingly, Defendant may properly be personally brought before this Court

pursuant to 42 Pa. C.S. § 5301(a)(2).

**D.      Plaintiff Has Exhausted Her Administrative Remedies; Her Federal and State Law Claims are Properly Before This Court.**

14.      Plaintiff has satisfied all procedural and administrative prerequisites under 29 U.S.C. § 626 and 43 P.S. § 959 and may now proceed to bring this action before the Court. Specifically:

> a.   On or about January 21, 2025, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") seeking redress for the Federal Law Claims at charge number 533-2024-02159 (the "EEOC Charge").
>
> b.   On August 4, 2025, the EEOC issued the Notice of Right to Sue ("RTS Notice"), affording Plaintiff 90 days within which to timely file the Federal Law Claims and the State Law Claims. See **Exhibit A**, a true and correct copy of the RTS Notice.
>
> c.   The instant complaint is filed within the 90-day time period.

## FACTUAL BACKGROUND

15.      Plaintiff, a 65-year-old female, commenced her employment with Defendant in or around April 2019 as a leasing consultant.

16.      Due to her strong performance, in September 2021, Defendant promoted Plaintiff to the position of Assistant Property Manager, where she worked at Defendant's facility known as The View North Hills ("The View").

17.      In her role as Assistant Property Manager, Plaintiff's responsibilities included, but were not limited to, addressing tenant concerns, evicting tenants, coordinating maintenance, assuring compliance with regulations, and assisting with leasing.

18.      Plaintiff was a salaried employee earning approximately $55,000.00 annually,

which, with the inclusion of performance-based bonuses, resulted in total annual earnings of approximately $72,000.00.

19.     Plaintiff consistently performed her duties to a high standard, evidenced by her promotion and, as recently as January 2024, her receipt of a $5,000.00 bonus for "exceeding expectations."

## The Onset of Age-Based Discrimination and Harassment

20.     Despite Plaintiff's excellent performance, beginning in late 2022, Plaintiff became the target of discrimination and harassment at the hands of her supervisors and colleagues.

21.     In or around November 2022, Defendant hired a new maintenance supervisor, Matt McNemar ("Mr. McNemar"), who, throughout his tenure, constantly verbally harassed and cursed at Plaintiff.

22.     Plaintiff reported Mr. McNemar's abusive behavior to her direct supervisor, Property Manager Carly Harshman ("Ms. Harshman"), on multiple occasions and expressed that she was afraid of being alone with him due to his aggression.

23.     Ms. Harshman refused to address Mr. McNemar's conduct and instead dismissed Plaintiff's concerns, stating that Mr. McNemar was Plaintiff's "equal" and she should respect him as such, thereby sanctioning the harassment.

24.     Also in November 2022, Defendant hired a new leasing agent, Sarah Ross ("Ms. Ross"), who was in her mid-twenties and significantly younger than Plaintiff.

25.     Following Ms. Ross's hiring, Ms. Harshman began a pattern of excluding Plaintiff from management meetings and decisions. For example, on or about February 1, 2023, Ms. Harshman held a management meeting with Regional Manager Jessica Hoover ("Ms. Hoover") but did not invite Plaintiff to attend or contribute, despite Plaintiff being the Assistant Property

Manager and present in the office.

26.     Ms. Harshman also frequently belittled and mocked Plaintiff for her perceived technological capabilities, at times referencing her age, despite Plaintiff taking classes on her own time to improve her skills with Microsoft Office applications.

#### Plaintiff's Reports of Discrimination and Defendant's Subsequent Retaliation

27.     The discriminatory conduct escalated when Ms. Harshman selected the substantially younger and less-tenured Ms. Ross to attend the Certified Apartment Leasing Professional ("CALP") program, a valuable career advancement opportunity.

28.     Upon information and belief, Ms. Harshman was grooming Ms. Ross to take Plaintiff's position, a fact corroborated when Ms. Ross informed Plaintiff she was chosen for the program because, "I'm gonna be the assistant manager."

29.     When Plaintiff, a dedicated employee of nearly four years, requested the same opportunity to attend the CALP program, Ms. Harshman denied the request.

30.     On or about February 10, 2023, Plaintiff engaged in legally protected activity by making a formal report of age discrimination to Defendant's Human Resources ("HR") department through HR officer, Michael Pico ("Mr. Pico").

31.     Rather than remedying the discrimination, Ms. Harshman immediately began to retaliate against Plaintiff. Ms. Harshman informed Plaintiff that while she was now "approved" for the class, Ms. Ross would be attending the imminent session and the class was only offered "once every five years," rendering the approval meaningless.

32.     After Plaintiff's attempts to address the issue with Ms. Hoover went unanswered, Plaintiff was forced to make a second report of age discrimination and retaliation to Mr. Pico in or around March 2023.

33.    Only after HR's second intervention was Plaintiff finally afforded the opportunity to attend the CALP program.

### The Intensified Campaign of Retaliation and Hostile Work Environment

34.    In or around January 2024, Ms. Harshman was transferred, and Jenn Morales ("Ms. Morales") became the new Property Manager at The View. Upon information and belief, Ms. Morales was a close personal friend of Ms. Hoover, the Regional Manager who had been reprimanded as a result of Plaintiff's protected complaints.

35.    Immediately upon her arrival, Ms. Morales began a relentless campaign of retaliation against Plaintiff, severely intensifying the hostile work environment.

36.    Despite Plaintiff's recent performance bonus for "exceeding expectations," Ms. Morales relentlessly criticized Plaintiff's work, blamed Plaintiff for any and all issues that arose, and complained that Plaintiff "had no idea what she was doing."

37.    In March 2024, Ms. Morales placed Plaintiff on a baseless and pretextual Performance Improvement Plan ("PIP") that was designed not to improve performance, but to harass Plaintiff and create a paper trail to justify her termination.

38.    The PIP was filled with trivial and manufactured criticisms, such as "the misplacement of a comma," and rapidly grew from five (5) to fifteen (15) items in just three weeks.

39.    Ms. Morales used the PIP to create an impossible, no-win situation for Plaintiff. For example, Ms. Morales disciplined Plaintiff for following established company precedent—a practice previously approved by other managers, including Ms. Hoover—and then added the manufactured "error" to the PIP.

40.    Further, Ms. Morales instructed Plaintiff to engage in unethical business practices,

ordering her not to credit residents for verifiable overcharges, including one instance of a $434.00 overcharge, because Ms. Morales "didn't want her various reports to be messed up."

41.    In a final act of retaliation, Defendant, at Ms. Morales's direction, refused to pay for Plaintiff's real estate license renewal—a benefit afforded to other employees—under the pretext that there "wasn't enough money on the card."

### Plaintiff's Constructive Discharge

42.    The unrelenting harassment, scrutiny, and gaslighting by Ms. Morales took a severe toll on Plaintiff's health. The constant criticism, which included Ms. Morales emailing Plaintiff on weekends to detail her supposed failings, directly caused Plaintiff to suffer a debilitating panic attack, an experience she had never had before.

43.    The work environment became so toxic and medically detrimental that Plaintiff's Physician Assistant Specialist, Maria Palombo, advised Plaintiff that she could no longer continue in the environment and must leave for the sake of her own mental health.

44.    In or around early April 2024, just three weeks into the sham PIP, Ms. Morales told Plaintiff, "I don't know, it's been 3 weeks and you're still making mistakes." When Plaintiff asked directly if she was going to be fired, Ms. Morales ominously replied, "I don't know," effectively confirming that her termination was imminent.

45.    Faced with an intolerably hostile work environment, unethical directives, constant harassment, and the clear signal that she was about to be terminated, Plaintiff was left with no choice but to resign.

46.    On May 15, 2024, because the environment created by Defendant was so abhorrent that no reasonable person in Plaintiff's position could be expected to continue working, Plaintiff was constructively discharged from her position.

47.     Subsequent to her constructive discharge, Plaintiff's claims were substantiated by the EEOC investigator, who, upon information and belief, reviewed Plaintiff's entire performance history, found no legitimate basis for the PIP, and communicated to Plaintiff that she was "definitely targeted."

48.     Furthermore, upon information and belief, an EEOC supervisor reported to Plaintiff that Defendant's leadership had admitted that "if it wasn't for her age, she would still be working there," confirming that Defendant's proffered reasons for its adverse actions were a pretext for unlawful age discrimination.

## COUNT I
## AGE DISCRIMINATION IN VIOLATION OF THE ADEA AND THE PHRA
### 29 U.S.C. § 621, *et seq.*; 43 P.S. § 951, *et seq.*

49.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

50.     The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

51.     Similarly, the Pennsylvania Human Relations Act ("PHRA") prohibits employers from discriminating against individuals with respect to compensation, hire, tenure, term, condition, or privilege of employment on the basis of age. 43 P.S. § 955(a).

52.     The protections of the ADEA and PHRA extend to individuals who are 40 years of age or older.

53.     To establish a *prima facie* case of age discrimination, a plaintiff must demonstrate: (1) she is forty years of age or older; (2) she was qualified for the position in

question; (3) she suffered an adverse employment action; and (4) the employer gave more favorable treatment to an employee who is sufficiently younger to permit an inference of age discrimination. *Maresca v. Blue Ridge Communs.*, 363 F. App'x 882, 885 (3d Cir. 2010).

**A.    Plaintiff is a Member of a Protected Class.**

54.    At all times relevant to this Complaint, Plaintiff was at least 59 years old.

55.    As such, Plaintiff is a member of the class of persons protected from age discrimination by the ADEA and the PHRA.

**B.    Plaintiff Was Qualified to Perform the Essential Duties of Her Job.**

56.    Plaintiff possessed and exercised the skill, experience, and ability needed to perform the essential functions of her role as Assistant Property Manager.

57.    Plaintiff's qualifications are evidenced by her successful employment with Defendant for nearly five years, her promotion to Assistant Property Manager in September 2021, and her history of satisfactory performance.

58.    As recently as January 2024, a mere four months before her constructive discharge, Defendant awarded Plaintiff a $5,000.00 bonus and her manager informed her that she was "exceeding expectations."

59.    At all times material, Plaintiff was qualified to perform the essential duties of her position.

**C.    Plaintiff Suffered Adverse Employment Actions.**

60.    The Third Circuit has held that an "adverse employment action" is an action taken by an employer which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 765 (3d Cir. 2004).

61.    Defendant subjected Plaintiff to numerous adverse employment actions,

including, but not limited to: denying her a valuable career advancement opportunity that was given to a substantially younger colleague, placing her on a pretextual Performance Improvement Plan ("PIP"), subjecting her to a hostile work environment, and ultimately constructively discharging her from employment.

62.     Specifically, Defendant, through Ms. Harshman, denied Plaintiff the opportunity to attend the CALP program while simultaneously granting that opportunity to a significantly younger, less-qualified, and less-tenured employee, Ms. Ross.

63.     Further, Defendant, through Ms. Morales, placed Plaintiff on a sham PIP filled with manufactured criticisms to create a pretext for her termination.

64.     As a direct result of Defendant's discriminatory conduct, which created an intolerable work environment, Plaintiff suffered the ultimate adverse employment action when she was constructively discharged on May 15, 2024.

**D.    The employer gave more favorable treatment to an employee who is sufficiently younger to permit an inference of age discrimination.**

65.     Defendant's adverse employment actions against Plaintiff occurred under circumstances that give rise to a clear inference of intentional age discrimination.

66.     Defendant repeatedly favored a substantially younger, less experienced employee, Ms. Ross (age mid-twenties), over Plaintiff (age 65), for a career advancement opportunity.

67.     Defendant's discriminatory animus was made clear when Ms. Harshman selected Ms. Ross for the CALP program and Ms. Ross informed Plaintiff she was selected because, "I'm gonna be the assistant manager," signaling Defendant's intent to replace Plaintiff with a younger employee.

68.     Plaintiff's supervisor, Ms. Harshman, also belittled Plaintiff and mocked her technological capabilities, at times referencing her age.

69.    The inference of discrimination is further supported by the fact that Plaintiff was performing her job at a level that "exceeded expectations" just months before Defendant began its intense campaign of scrutiny and discipline.

70.    Upon information and belief, Defendant's leadership admitted that age was the reason for its actions, with an EEOC supervisor reporting to Plaintiff that "if it wasn't for her age, she would still be working there."

**E.    Defendant's Conduct Was Willful and Plaintiff is Entitled to Liquidated and Punitive Damages.**

71.    A plaintiff may recover liquidated damages under the ADEA if they can demonstrate the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Argue v. David Davis Enters.*, No. 02-9521, 2008 U.S. Dist. LEXIS 11416, at *7 (E.D. Pa. Feb. 15, 2008).

72.    Similarly, punitive damages may be awarded under the PHRA where a defendant has engaged in discriminatory practices with malice or with reckless indifference to the protected rights of the plaintiff.

73.    The terms "malice" and "reckless indifference" pertain specifically to the Defendant's knowledge that it acted in violation of the law rather than an awareness of engaging in "discrimination". *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999).

74.    At all times relevant herein, Defendant knew or showed reckless disregard for whether its conduct towards Plaintiff violated the ADEA and PHRA.

75.    Defendant's management was aware of Plaintiff's repeated complaints of age discrimination, yet they not only failed to stop the discriminatory conduct but escalated it into a retaliatory campaign designed to force Plaintiff from her job.

76.    Defendant's conduct, including the age-related comments by its managers, the

plan to replace Plaintiff with a younger employee, and the admission that Plaintiff would still be employed "if it wasn't for her age," demonstrates that Defendant acted with malice and/or reckless indifference to Plaintiff's federally and state-protected rights, thereby constituting a willful violation.

77.    As a direct and proximate result of Defendant's discriminatory conduct in violation of the ADEA and the PHRA, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Janine Zimmers, seeks a judgment against Defendant, AION Management, LLC, for willful noncompliance of the ADEA and PHRA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) liquidated damages under the ADEA for a willful violation; (iii) punitive damages under the PHRA in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iv) equitable relief in the forms of back pay and front pay; (v) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (vi) pre-judgment and continuing interest; and (vii) any further legal and equitable relief as this Court may deem just and proper.

## COUNT II
### RETALIATION IN VIOLATION OF THE ADEA AND THE PHRA
### 29 U.S.C. § 621, *et seq.*; 43 P.S. § 951, *et seq.*

78.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully

set forth at length herein.

79.    The ADEA makes it unlawful for an employer to discriminate against any employee "because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

80.    Similarly, the PHRA makes it unlawful for any employer to "discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 P.S. § 955(d).

81.    To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in a legally protected activity; (2) her employer took a materially adverse action against her; and (3) a causal connection exists between the protected activity and the adverse action. *Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 242 (4th Cir. 1997).

**A.    Plaintiff Engaged in Legally Protected Activity.**

83.    Plaintiff engaged in legally protected activity under both the ADEA and the PHRA when she opposed practices she reasonably believed to be unlawful age discrimination.

84.    Specifically, Plaintiff engaged in protected activity on or about February 10, 2023, when she made a formal report of age discrimination to Defendant's HR department regarding Ms. Harshman's discriminatory conduct, including the denial of the CALP program opportunity in favor of a substantially younger employee.

85.    Plaintiff again engaged in protected activity on or about March 5, 2023, when she made a second report to HR, complaining that Ms. Harshman was continuing the discrimination and actively retaliating against her for her initial complaint.

**B.    Defendant Subjected Plaintiff to Materially Adverse Employment Actions.**

86.    An adverse employment action in the retaliation context is one that is serious and tangible enough to dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).

87.    Immediately following Plaintiff's protected activities, Defendant, through its managers and supervisors, subjected Plaintiff to a continuous and escalating series of materially adverse employment actions.

88.    These adverse actions include, but are not limited to:

a.    Increased scrutiny and being held to a higher standard than her colleagues by Ms. Harshman immediately following her first complaint;

b.    Ms. Harshman's initial refusal to allow Plaintiff to attend the CALP program, even after HR intervened, thereby rendering the initial "remedy" meaningless;

c.    Subjecting Plaintiff to a systematic and protracted campaign of retaliation designed to punish her for reporting discrimination;

d.    The installation of Ms. Morales, a close personal friend of a manager who was reprimanded due to Plaintiff's complaints, for the purpose of intensifying the retaliatory campaign;

e.    The relentless and baseless criticism of Plaintiff's work by Ms. Morales, despite Plaintiff's history of excellent performance;

f.    Placing Plaintiff on a sham, pretextual Performance Improvement Plan ("PIP") in March 2024, which was used as a tool for harassment;

g.    The refusal to pay for Plaintiff's real estate license renewal, a benefit afforded to other employees; and

h.    The ultimate adverse action of constructively discharging Plaintiff from her

employment on May 15, 2024, by creating an intolerable work environment.

**C.    A Causal Link Exists Between Plaintiff's Protected Activity and the Adverse Actions.**

89.    A causal connection between the protected activity and the adverse actions is established by the close temporal proximity between Plaintiff's complaints and the onset of the retaliation, as well as the ongoing pattern of antagonism that followed.

90.    The retaliation by Ms. Harshman began "almost immediately" after Plaintiff's first complaint to HR on February 10, 2023.

91.    The campaign of retaliation was continuous and escalated over time, culminating in the intensified harassment under Ms. Morales, who, upon information and belief, was installed as manager specifically to retaliate against Plaintiff due to her close relationship with the previously reprimanded Regional Manager, Ms. Hoover.

92.    This unbroken chain of retaliatory conduct, from the initial complaint to the sham PIP and eventual constructive discharge, establishes a clear causal link between Plaintiff's legally protected activity and the adverse actions she suffered.

**D.    Defendant's Conduct Was Willful and Plaintiff is Entitled to Liquidated and Punitive Damages.**

93.    A plaintiff may recover liquidated damages under the ADEA if they can demonstrate the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Argue v. David Davis Enters*., No. 02-9521, 2008 U.S. Dist. LEXIS 11416, at *7 (E.D. Pa. Feb. 15, 2008). Punitive damages may be awarded under the PHRA where a defendant has engaged in retaliatory practices with malice or with reckless indifference to the protected rights of the plaintiff.

94.    At all times relevant herein, Defendant knew or showed reckless disregard for whether its conduct towards Plaintiff violated the anti-retaliation provisions of the ADEA and

16

PHRA.

95.     Defendant was put on direct notice of Plaintiff's protected activity through her formal complaints to its own HR department.

96.     Rather than taking prompt and effective remedial action to stop the discrimination and prevent retaliation, Defendant's managers engaged in and escalated a campaign of retaliation designed to punish Plaintiff and force her out of the company.

97.     This deliberate course of conduct, undertaken by managers in response to Plaintiff's legally protected complaints, demonstrates that Defendant acted with malice and/or reckless indifference to Plaintiff's federally and state-protected rights, thereby constituting a willful violation.

98.     As a direct and proximate result of Defendant's retaliatory conduct in violation of the ADEA and the PHRA, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Janine Zimmers, seeks a judgment against Defendant, AION Management, LLC, for willful noncompliance of the ADEA and PHRA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) liquidated damages under the ADEA for a willful violation; (iii) punitive damages under the PHRA in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iv) equitable relief in the forms of back pay

and front pay; (v) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (vi) pre-judgment and continuing interest; and (vii) any further legal and equitable relief as this Court may deem just and proper.

**COUNT III**
**HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF THE ADEA AND THE PHRA**
**29 U.S.C. § 621, *et seq.*; 43 P.S. § 951, *et seq.***

99.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

100.     To establish a hostile work environment claim under the ADEA and PHRA, an employee must show that "(1) the employee suffered intentional discrimination because of his/her age, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the Plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability." See *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

101.     The standard requires an examination of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

**A.     Plaintiff Suffered Intentional Discrimination Because of Her Age.**

102.     As stated above, throughout the course of her employment, Plaintiff was targeted with intentional discrimination by Defendant's managers and supervisors because of her age.

103.     Specifically, Plaintiff's supervisor, Ms. Harshman, frequently belittled and mocked Plaintiff for her perceived technological capabilities, at times referencing her age.

104.     Further, Ms. Harshman and Defendant demonstrated a clear preference for a

18

substantially younger employee, Ms. Ross, whom they intended to replace Plaintiff with, as evidenced by Ms. Ross being told she was chosen for the CALP program because, "I'm gonna be the assistant manager."

105.    The age-based animus driving Defendant's actions was confirmed when, upon information and belief, an EEOC supervisor reported to Plaintiff that Defendant's leadership admitted that "if it wasn't for her age, she would still be working there."

106.    Therefore, Plaintiff was intentionally targeted with a hostile work environment because of her age.

**B.    The Discrimination Plaintiff Endured was Severe and Pervasive.**

107.    At all times relevant hereto, the discrimination Plaintiff experienced was both severe and pervasive. The 'severe or pervasive' standard requires conduct sufficient 'to alter the conditions of [the employee's] employment and create an abusive working environment.' *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214-15 (3d Cir. 2017).

108.    The hostile work environment was created and perpetuated by a continuous pattern of conduct from multiple managers and employees, which included, but was not limited to:

　　　a.    Constant verbal harassment and cursing from a colleague, Mr. McNemar, which Plaintiff's supervisor, Ms. Harshman, refused to address, instead sanctioning the behavior;

　　　b.    Systematic exclusion from management meetings and decisions by Ms. Harshman;

　　　c.    Relentless criticism and a campaign of gaslighting by Ms. Morales, who placed Plaintiff on a baseless Performance Improvement Plan ("PIP") that grew from five to fifteen manufactured deficiencies in three weeks for items

as trivial as "the misplacement of a comma;"

d.  Directives from Ms. Morales to engage in unethical business practices, placing Plaintiff in an untenable professional position; and

e.  Unrelenting scrutiny, including Ms. Morales emailing Plaintiff on weekends to detail her supposed failings.

109.  This conduct was unconsented to by Plaintiff, unreasonably interfered with the performance of her work duties, and persisted and escalated over the course of many months.

110.  The quality and quantity of discrimination, harassment, and retaliation effectuated by Defendant's managers and employees pervaded Plaintiff's entire work environment and was sufficiently severe and pervasive in nature to alter the conditions of her employment and create an abusive working environment.

**C.    The Discrimination Detrimentally Affected Plaintiff.**

111.  As averred hereinabove, the hostile and abusive work environment created by Defendant was the direct and proximate cause of a severe decline in Plaintiff's mental and physical health.

112.  Specifically, the unrelenting harassment, scrutiny, and gaslighting by Ms. Morales directly caused Plaintiff to suffer a debilitating panic attack, an experience she had never had before in her life.

113.  The work environment became so medically detrimental that Plaintiff's Physician Assistant Specialist, Maria Palombo, advised Plaintiff that she must leave for the sake of her own mental health.

114.  As a direct and proximate cause of Defendant's conduct, Plaintiff was constructively discharged from her employment on May 15, 2024.

115.  The hostile environment, the severe toll on her health, and the ultimate loss of

her employment detrimentally affected Plaintiff.

**D.    The Discrimination Plaintiff Suffered Would Detrimentally Affect a Reasonable Person in Like Circumstances.**

116.    A reasonable person in Plaintiff's position would find the environment created by Defendant to be hostile and abusive.

117.    A reasonable person, having a history of excellent performance culminating in a bonus for "exceeding expectations," would be detrimentally affected by being suddenly subjected to a relentless campaign of criticism, placed on a sham PIP for trivial "errors," and told their job was in jeopardy.

118.    A reasonable person would be detrimentally affected by being subjected to constant verbal abuse by a coworker that management refuses to address.

119.    Furthermore, a reasonable person would find it intolerable to be ordered by a supervisor to engage in unethical business practices such as refusing to credit customers for known overcharges.

120.    Indeed, the environment was so abhorrent that no reasonable person could be expected to continue working under such conditions.

121.    Despite Plaintiff's repeated pleas for help to HR and management, Defendant permitted the hostile conduct to continue and escalate. Any reasonable individual in Plaintiff's position would find these actions hostile and abusive.

**E.    Respondeat Superior Liability Exists Due to Defendant's Overt Role in Facilitating the Discrimination.**

122.    *Respondeat superior* liability exists where a supervisor creates a hostile work environment or where the employer was negligent or reckless in failing to take remedial action upon notice of harassment. See *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir. 1997).

**F.    The Hostile Conduct Occurred Within the Scope of the Supervisors' Employment.**

123.    At all times relevant herein, the hostile conduct was perpetuated by Plaintiff's supervisors, Ms. Harshman and Ms. Morales, at Plaintiff's place of work and during scheduled working hours.

124.    More specifically, the hostile conduct—including the exclusion from meetings, the creation of the sham PIP, the relentless criticism, and the unethical directives—occurred while Ms. Harshman and Ms. Morales were exercising their supervisory responsibilities over Plaintiff.

125.    As such, the tortious conduct occurred within the scope of the supervisors' employment.

**G.    Defendant was Negligent and Reckless in its Failure to Discipline, Fire, or Take Remedial Action Upon Notice of the Harassment.**

126.    At all times relevant herein, Defendant was aware of the hostile conduct, as Plaintiff reported Mr. McNemar's harassment to Ms. Harshman and reported the age-based discrimination and retaliation to Defendant's HR department on at least two separate occasions.

127.    Despite Plaintiff's numerous reports, Defendant failed to take effective remedial action.

128.    Instead of correcting the behavior, Defendant allowed it to continue and escalate, culminating in the intensified campaign of harassment by Ms. Morales, who, upon information and belief, was installed as manager for the very purpose of retaliating against Plaintiff.

129.    Defendant's failure to act, and its subsequent escalation of the harassment, constitutes negligence and recklessness.

**H.    The Supervisors Were Aided by Defendant in Effectuating a Hostile Environment.**

130.    As averred hereinabove, Defendant's management, including Ms. Harshman,

Ms. Morales, and Ms. Hoover, had actual knowledge of the hostile behavior toward Plaintiff.

131.    Rather than correct the hostile behavior, Defendant empowered its supervisors to continue and intensify the conduct. Ms. Harshman and Ms. Morales used the authority vested in them by Defendant to deny Plaintiff opportunities, place her on the pretextual PIP, and subject her to constant scrutiny.

132.    Defendant further aided its supervisors by failing to meaningfully intervene after Plaintiff's HR complaints and by allowing the retaliatory and hostile environment to fester and worsen, ultimately leading to Plaintiff's constructive discharge.

133.    Accordingly, *respondeat superior* liability attaches to Defendant as it failed in its duty as an employer to properly discipline its employees and provide a work environment free of hostility.

134.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Janine Zimmers, seeks a judgment against Defendant, AION Management, LLC, for its creation and maintenance of a hostile work environment in violation of the ADEA and PHRA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future

conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the

costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (v)

pre-judgment and continuing interest; and (vi) any further legal and equitable relief as this Court

may deem just and proper.

## JURY DEMAND

135.    Plaintiff demands a trial by jury on all matters so triable.


Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date: October 31, 2025             By: _/s/ Brendan K. Petrick_
                                   Brendan K. Petrick, Esq. (Pa. I.D. No 88968)

                                   _/s/  Patrick W. Carothers_
                                   Patrick W. Carothers, Esq. (Pa. I.D. No 85721)

                                   _/s/ Elizabeth A. Murphy_
                                   Elizabeth A. Murphy, Esq. (Pa. I.D. No. 334769)

                                   The Workers' Rights Law Group, LLP
                                   Foster Plaza 10
                                   680 Andersen Drive, Suite 230
                                   Pittsburgh, PA 15220
                                   Telephone: 412.910.8025
                                   Fax: 412.991.7510
                                   brendan@workersrightslawgroup.com
                                   patrick@workersrightslawgroup.com
                                   elizabeth@workersrightslawgroup.com

                                   _Counsel for Plaintiff, Janine Zimmers_